10 and 10? 15 and 5. 15 and 5. Okay, the clerk has that. Yes. Go ahead and do this one at 15, Madam Clerk. Yes. Okay. Counsel? May it please the Court. My name is Roberta Anner Hughes, and I, with my partner Cliff Edwards, represent Patrick Vignon and Clayton Riddle and their families, who were victims of the Libby asbestosis mine tragedy. They are victims, once again, of Amgen and Immunex drug companies who involved them in a study that provided them Enbrel and provided them great relief, only to be pulled away from them in spite of a promise that they would receive the drug after the study should the companies decide to close down the study. Help me on something here. It says in your brief at page 8, prior to agreeing to enter the clinical study at issue, Vignon and Riddle met with Dr. Whitehouse, who told them that if they entered the study and did well, the company would provide Enbrel to them without cost for as long as Dr. Whitehouse believed it to be helpful, whether the study continued or not. And then it says EXCE at pages 22-23. I couldn't find it. Help me find it. I don't know what EXCE means, and I couldn't find it. Oh, that is an excerpt of record. The excerpts of record that we put together in this case, I will find it. It's an EXCUN excerpt. Yes, it's an excerpt of record. I'm sorry. The excerpts of record that we put into this case are a tad bit confusing, I will concede. So I look at E, and what I've got there, I've got the Form 10-K that was submitted to the Securities and Exchange Commission, and it doesn't have pages 22 and 23. This struck me as the crucial statement in your statement of facts, and I was trying to find out what the support for it was, and I thought maybe you had a typo there or something, but I just can't find it. Your Honor, we may very well have a typo, and when I have an opportunity I will look for it and get back to you where the particular excerpt is. Okay, leaving aside that particular, and I hope you'll show it to me on rebuttal, more generally, where is the evidence in here that Enbrel promised the drug without cost after the study ended, or that Dr. Whitehouse, on behalf of Enbrel, or appearing to be on behalf of Enbrel, promised the drug without cost after the study ended? Just show me the evidence. When Kleinfeld said Enbrel, I'm reading his question to mean Amgen and Immunex. Yes. The makers, that's what you're asking, right? I thought the drug was named Enbrel. I mix up these names, though. I'm sure you're right. The drug is named Enbrel. The two companies are Amgen and Immunex. Yes, exactly. If nothing else, the evidence appears in our reply brief in which our ---- No, no. Reply brief is not evidence submitted under Rule 56 to prevent summary judgment. I want evidence in the excerpt to record. If you look in the excerpt to record, under the two depositions of the two gentlemen that were taken, Patrick Vinyon and Clayton Riddle, they both testified to that effect. In fact, we ---- Show me the page. I didn't see it. This is the case. So I've got to see the evidence. It is in excerpt M, which is a deposition of Patrick Vinyon, page 29, line 16 through 30, page 30, line 8. Hold on. M, a deposition of Vinyon. What page? 29, line 16 through 30, line 8. Did he tell you, that refers to the doctor? Yes, Dr. Whitehouse. That the drugs would be provided to you after the study was completed, if the drug was beneficial to you, free of charge. Absolutely. Okay. That's Vinyon. And then, as far as Mr. Riddle is concerned, if you look at excerpt N, which is the deposition of Patrick Riddle, page 10, line 22, through 11-2. Okay. And the he in both of these refers to the doctor, right? Yes, Dr. Whitehouse. Now, the next step, that would set up the genuine issue of fact on whether the doctor said it to these patients. The next step is showing either that the drug company authorized the doctor to say it to these patients. I'm leaving aside parole evidence for the time being. Either the doctor authorized, was authorized by the company to say it to the patients, or was apparently authorized. Is there any evidence that he was actually authorized? The mere fact that he was the only person who was allowed to speak to these people and give them any information about the study, period, is evidence. You want us to, that's circumstantial evidence from which you would infer what apparent authority, actual authority? Both apparent and actual authority. However, if you also look at the consent forms, which is the only form that these gentlemen saw, the consent forms indicate that Dr. Whitehouse, who is the study doctor, is the person who can give them information about the study in and of itself. I thought on the consent form you had a problem here, because the consent form says that your participation will be for 12 months unless you withdraw, or the study doctor, or Immunex, the drug company, terminates the study. And I can't see where it says anywhere here that they have a right to get the drug for free after the study. Have I missed it? Well, if you look on page 6 of that consent form, the form itself does not specifically say you will continue to receive the drug. What the form itself says, actually the consent form is silent on whether or not the drug will be provided afterwards. It's clear on whether it will be provided during, but it is silent on whether or not it will be given after. If you look on page 6 of that consent form, the very last paragraph describes what these gentlemen knew, and that is the study doctor or Immunex Corporation may decide to withdraw you or terminate this clinical study for either medical or administrative reasons. For example, because the research is not beneficial or the study resources are no longer available. At any time, with and without your consent, if the study is discontinued, the study doctor, who is Dr. Whitehouse, will notify you and your study doctor, Dr. Whitehouse, will advise you of available treatments that may be of benefit. Why would we infer from that that the drug would be free after termination? I don't think we infer necessarily that the drug will be free from that statement itself, but it indicates that Dr. Whitehouse has the ability to tell these people what happens at the end of the drug study itself and what is available to them and how they will be able to use it. It gives our people notice that they can rely on what Dr. Whitehouse has to say in this situation. I don't understand that. It says your study doctor will advise you of available treatments. My doctor advises me all the time of available treatments for this and that that may be of benefit, now cost a fortune. But if your doctor advised you that you were able to get a treatment and you were going to be provided that treatment without having to pay for it, you would be able to rely on that, or you should be able to rely on that, as long as it's a reasonable representation. What the drug company did here --" Okay, that leads us to the next question about the record. Where in the record does it show that the doctor told these two men that they would get subsequent supplies of the medicine for free? In Dr. Whitehouse's testimony, I know that the discussion about whether or not this would be free has become a central issue for Judge Malloy. It's the only issue in the case, isn't it? I mean, they can still get the drug. They just can't get it for free, and it's very expensive. What these gentlemen heard was that it would be for free. They heard that directly from Dr. Whitehouse. Now show me where the doctor says this. What Dr. Whitehouse says is that he didn't use the word free, so there's a disagreement of the facts there, but he assumed on some level it would be. The assumption is reasonable, given what the company did in the case of Dr. Knighton's study. In particular, if you look at Excerpt E, Number 37, if you look at Excerpt E, 37, it's a letter to Dr. Hayes, who is the doctor at issue here, from Dr. Knighton. Okay. This letter... I'm sorry. I'm at a loss. They turn to E, and it's at Form 10-K. It's way behind it, Number 37. The second excerpt is a record of Number 37. Got it. Thank you. This is a letter to Dr. Hayes, the same doctor who supposedly made this promise. This is a letter to her from Dr. Knighton. He says he is confirming a conversation they had. He goes on to say, As discussed with you and approved by you at the time the study was closed for the approval of new patients, the patients on the study drug would be continued on therapy indefinitely until either a serious adverse event secondary to the drug or their death. The decision was to continue the therapy beyond the one-year study protocol on a compassionate basis was because of my concern that the discontinuation of what appeared to be effective therapy, even with crossover to the current standard but ineffective therapy, would result in an acute exacerbation of their disease with death. I had always thought that that phrase, compassionate basis, meant where the FDA has not found the drug to be safe and effective, nevertheless, if the patient is terminal, the doctor is permitted to prescribe it on a compassionate basis. They don't think it will work, but he's dying anyway, so the terminal patient can get the drug. I didn't see anything in the record to show that it had an understood meaning in the medical field of being for free. Well, in this instance, it certainly does. Why does it say that? Well, in the instance of a study of Enbrel and what Dr. Hayes was promising, because what Dr. Hayes promised to Dr. Whitehouse is exactly the same promise she apparently made to Dr. Knighton, because while this letter says nowhere for free, nor does, if you look at the letter at tab 40, Dr. Knighton's letter to Jonathan Leff, a doctor at Amgen, this letter doesn't reference for free either, but the facts bear that out, that when they were talking about compassionate use, they were talking about use without cost to the patient. Where does it say that in the record? As far as I can tell, both patients can still get the drug, the doctor is still willing to prescribe it, and the company is still willing to supply it. The dispute is just about whether it's free. And particularly when it comes to these people, that is why the free is clearly implied here in some way, shape, or form and was understood by our people for this very reason. They could have done that and not ever been involved in a study whatsoever. If they could afford it, they didn't have to go through any kind of study, they didn't have to agree to be in one. Dr. Whitehouse could have prescribed an off-label use of this drug if they could have afforded it from day one. They didn't have to go through a study to have that happen. He specifically goes to them and says, I talked to them because I know this question is going to come up and I want to make sure I know the answer to this. So whatever he said to them. Can I ask you to approach this from a slightly different angle, if you can? You know, the law of apparent authority, I believe in Montana and probably just about every other state in the union, is that the apparent authority has to be derived from some manifested communication of the principle, not the apparent agent. So in terms of establishing apparent authority, what Dr. Vinyan says, standing alone isn't enough. If Dr. Vinyan says, I can get this drug free and I'm authorized to do that, that would not create apparent authority, I think, under the law unless Amgen or Immunex themselves had done something that created that image. So what did Amgen or Immunex do in this case that supports apparent authority? In Montana you can also have this as a result of an omission as well, but that said. An act or omission. No, I realize that, but what's the act or omission of Immunex or Amgen that's material to apparent authority? First of all, they clothed Dr. Whitehouse with complete authority to speak to these people and didn't take it upon themselves to do any speaking to them. Secondly, the consent form that we saw did not speak to what would happen after the study as far as the provision of Enbrel, period. And third, the consent form specifically identified Dr. Whitehouse as having the ability to tell these people what their options were at the end of this study. The form does say that at the end of the study. Here I thought the testimony was that he said, you get the drug free before the study started. No, at the end of the study. If they should choose to stop the study. Their testimony about the doctor's statement, when did they say that occurred? They said it occurred before they actually signed up to be a part of the study. But the representation was how long Enbrel would be provided to them after the study. If they decided to stop the study. And I see my time is up. Thank you, counsel. May it please the court, Judge Kleinfeld, members of the panel, and Mark Gately. I represent Eminex and Amgen. As Judge Kleinfeld said, and Judge Malloy said repeatedly, both in his motion to dismiss opinion and his motion for summary judgment opinion, there's really only one issue here, and that's whether free drug was promised. Not whether it was promised by Dr. Whitehouse, but whether it was promised by Eminex. To give a bit of a chronology, everyone agrees, or at least all of the evidence, is in agreement that there is only one meeting that is critical here. It was a meeting that took place in either May or June of 2000, before the study existed. Indeed, the purpose of the meeting was to determine if Dr. Whitehouse wanted to run this study. And that meeting took place in Spokane. And the testimony from what happened at that meeting, the only meeting at which a promise could possibly have been made, is entirely consistent. All three participants, including Dr. Whitehouse, testify, and if the court needs it I can give record references, although I think it's in the brief, that the word free never came into the discussion at all. That's actually a quote from Dr. Whitehouse. Dr. Whitehouse also said that there was never, as he recalls, any discussion of the terms or of any cost issue. And finally, he was actually asked to go so far as to tell what he assumed. When he asked if he assumed ---- Could you refer so we can follow along? Yes, I can, Your Honor. Well, what you're talking about now, it would be nice to be able to mark up and underline. Yes, Your Honor. I'm more than happy to do that. The word free never came into discussion at all is supplemental extract of the record, 108-109. If the court please. And that is Dr. Whitehouse's testimony. This is the meeting of Dr. Whitehouse with the Immune or Amgen people, right? Yes, Your Honor. The plaintiffs weren't at that meeting. They were not, Your Honor. So just as one judge, the way I'm looking at this right now is that that meeting and that uniform testimony probably goes all the way to saying there was no actual authority. But there's still an issue because the plaintiff said or Whitehouse said they'd get the drug free. There's an issue whether Whitehouse had apparent authority. And I think that has to come if it does arise from an act or omission of Immunex or Amgen. But what about the argument that the appellant's counsel make that apparent authority is kind of vested by the consent form? Yes, Judge Gould, if I may answer that. The one thing I want to establish from the meeting is that there was no promise made, and I think that's clear. I don't even know that there's a dispute of it. Immunex made no promise. To get to the apparent agency question, if you please, Judge Gould, I have several responses. First of all, to go to the case law, the Abney case out of the Sixth Circuit and the Southers case out of the Southern District of New York, which involved discontinuation of a Parkinson's drug study there for safety reasons. But the discontinuation issue was the same, and the argument was there was a promise by the principal investigator, the doctor in the position of Dr. Whitehouse. In both of those cases, the court found no apparent agency under exactly the same circumstances. And indeed, particularly in Southers, Judge Castell went on at some length to discuss why it is so important in a clinical trial for a principal investigator to be independent, to not be under the control of, and to not be an agent of a drug company. Otherwise, the whole purpose of a clinical trial could be defeated. In terms of the apparent agency, Immunex did, it was only Immunex then. Amgen came in much later, as you know, Judge Gould, when they acquired. When they acquired. Amgen came in when they acquired Immunex. But Immunex, as was the case in Southers and Abney, and as Your Honor pointed out in questioning, they did nothing to vest Dr. Whitehouse with apparent authority. The record is clear that there was never any communication at all, none, not conversation. What did they look at in the record? What's the clearest thing in the record to show that they did not cloak Dr. Whitehouse with apparent authority? Well, there are a number of things, Your Honor, and I'm hoping to go through them. But first of all, that there was never any meeting or contact between. Well, this is all good. We know that they didn't apparently at that meeting say that the drug would be provided free, but the whole issue is what authority did these patients think that Dr. Whitehouse had, and in what position did the company put him? The company put him in the position of asking if he would run a study. It was not the company's study, as he himself testified, and as the record at the record shows, Judge Fletcher, it was his study. He was the principal investigator. I understand that, but isn't there a factual question as to whether it's clear the patients thought that he was their authority figure and they get all their information from him, and they say that he told them that it would be free? Well, Your Honor, I'm sorry. This is summary judgment, so we're having to look at this from several different angles to find out whether there is a disputed material fact. I understand that, Judge, and one of the questions is what they believed. And Mr. Riddle, for example, Mr. Riddle testifies, and this is at E in the record, in the record extract itself, not the supplemental, E-59, tab 59 of 15, that he had no idea that Immunex was involved when he talked to Dr. Whitehouse. So it's hard to imagine how he could have possibly relied on Dr. Whitehouse as being an agent of Immunex. Also, for Mr. Binion, Binion does not testify that Dr. Whitehouse said you will get Enbrel for free. What he testifies to, and this is in the supplemental record extract at 8182, which is page 28 of his deposition, he says that Whitehouse, quote, assured me that Anne Hayes had said that they had a very good compassionate use program and that if this drug worked for me, and then he goes on to say that he would get it for free. If so, he, Binion, never says that Dr. Whitehouse, even if we were to assume he's an agent, and I have some other answers to that, I think, Judge Fletcher, but he doesn't say, I, Dr. Whitehouse, am telling you, I am representing to you as Dr. Whitehouse, agent of Immunex, that you will get free Enbrel. He's repeating what Dr. Hayes says, which is, one, one, it's hearsay. More importantly, it is clearly, absolutely parole evidence, and barred as a result because it is inconsistent with the clinical trial agreement, which refers to him as an independent contractor, which specifically says that no drug will be shipped at the end of the study, which specifically says that when the study's over, the drug has to be returned or destroyed. It's inconsistent with the informed consent, which says free drug will only be provided during the study and will only be provided for 12 months. And also, the informed consent does not say, Judge Fletcher, to go to Dr. Whitehouse with any questions. It says to go to Dr. Whitehouse for medical questions. If there are questions about your right under the study, you're not to go to Dr. Whitehouse. You're to go to the Western Institutional Review Board. So under all of those circumstances, again, as with Abney and Southers, nothing was done by Immunex to vest Dr. Whitehouse with apparent authority. Indeed, under the plaintiff's theory, every time a doctor did a study, the doctor would become an apparent agent just because he's the one dealing with the patient Also, I'll point out, Your Honor. Maybe that's accurate. Pardon? Maybe that's accurate. But if that's the case, it is going to, as pointed out in Southers and Abney, there's no case that is ever held that I know of, and I think the plaintiffs would have found it if there was, that a doctor doing a clinical trial study is an apparent agent, and there are a number, particularly including the Abney case and the Southers case, saying why and why not. If that's the case, it's going to have an effect on clinical trials. Drug companies are going to be, I think it's logical to assume, loathe to let a principal investigator bind them to anything. Also here, Your Honor, I think it's somewhat important to note that all of the patients in this study, including Vinian and Riddle, were patients of Dr. Whitehouse before the study. These weren't people who came in at Immunex's behest or because Dr. Whitehouse said, I'm representing Immunex, which, by the way, he never did say. They were already Dr. Whitehouse's patients. So why is that material when Dr. Whitehouse says, do you want to participate in this study that I'm doing for Immunex? I don't think there's any evidence that he said it's a study I'm doing for Immunex. In fact, he said it was his study. He was the one who had the right to select participants. He was the one who had the right to take people out without any consultation from Immunex if he felt that they were in danger. And indeed, of the ten people in the study, he did take five of them out. He is given the authority to have complete, under the agreement in writing, complete scientific and technical control over the study. He is the one who had to submit the informed consent, which he finalized. He did work jointly with Immunex, but it was his document to submit to the WIRB for approval, as was the protocol. Also, when the study was extended in the second year, it specifically said in the informed consent that any prior agreement that is inconsistent It said in the study agreement. I'm sorry, Your Honor. It said in the study agreement, because it was meant to be a 12-month study and it was obviously extended for a second 12 months, any prior agreement, oral and written, is rendered void and superseded by this. So again, if we put aside all the factors showing he's not an apparent agent, the only thing he did was run a study, conduct a study, sponsor a study, and be the principal investigator in a study where Immunex supplied the drug, gave him a set amount of money, and had the right to the data. That's the only rights that Immunex had. Immunex didn't even have the right to know the names of the people in the study. But even if we assume he's an agent, he's clearly acting outside the scope of his agency, where it is clear in writing, and it is clear from his meeting in Spokane, that there is not to be free NREL after the study. So it's barred by parole evidence, and it's also outside the scope of his agency, even if we get a You could still be an apparent agent and have something be completely outside your actual authority. That's the usual case. But if you have an apparent agent, and the apparent agent can bind the principal by basically I'm sorry. I better leave that. By basically saying something that is absolutely unauthorized, I think that is outside of agency principles and grossly unfair. You would have somebody, you're told there is no free NREL, the documents make it clear there's no free NREL, and yet you take it upon yourself in violation of these writings to go and represent, well, Dr. Hayes said you'll get free NREL, when you know it's not true. This is all fine, what you're saying, but it's, if the individual has the apparent authority, he can violate all sorts of things that he perhaps couldn't do under the terms of the company. But apparent authority is what the company has allowed him to be in a position to hold out to others. But, Your Honor, with all due respect, I believe both an actual agent and an apparent agent can't go outside of their authority and bind the company. That even if they are agents, even if they have the ability to speak, they can't speak contrary to the authority that they're given. They may not, but if they do, they may still be the apparent agent, even though they've gone outside their actual authority. But, Your Honor, if they do that, and I think there are many reasons, and I hope between what I've said and the brief that we've made clear why Dr. Whitehouse is not an apparent agent, but if they do go outside their authority, it's not binding on the company under agency principles. One of the questions might be, and frankly, this was a question that Judge Malloy asked, did you sue the right person here? Maybe Dr. Whitehouse is liable if he made a representation to the plaintiffs that is barred by parole evidence and that he wasn't authorized to make. But Immunex should not be liable for that because Immunex not only didn't authorize him, but specifically to the contrary ended writing. Well, you could certainly have a situation where the apparent authority person is bound, but that Immunex might be able to sue them for having gone beyond their authority. But, Your Honor, I guess I can't ask – it's not my job to ask questions because no one was ever fortunate to put me on the bench, but how can a principal be bound by something that an apparent agent says that he absolutely is not authorized to say? Well, you may get a theoretical issue of what's the apparent scope of the agency. Yes, Judge Malloy. It's not just an apparent agent. You're looking at it from the point of view of the victims, the alleged victims, the plaintiffs who perceive that person has the right to act as an agent. It might be relevant to say what would be their perception of the scope of the agency. So I don't think Judge Fletcher is totally off the mark in saying you could have a case where someone is an apparent agent and finds a principal, which in turn can sue the apparent agent for violating their actual agency agreement. Where I'm hung up is where I started, which is if you just look at the consent form, which seems to be what appellants' counsel are relying on, coupled with the statement made by the doctor, in what ways would that consent form, in your opinion, not give Dr. Whitehead an apparent agency to act for Immunex? Well, one, Your Honor, it never indicates in any way that it is anything other than a study being run by Dr. Whitehouse. As to Immunex, it says that Immunex will provide the drug, and it will provide the drug for only 12 months. So the plaintiffs, any reasonable person should know from reading the informed consent that it is only for 12 months. There's no mention or hint in there of free Enbrel after the study's over, as Judge Maloney found. And to the contrary, it indicates that when the study is over, there won't be any free drug provided. It's only provided during the study. And also, the burden of proof on agency is obviously on the plaintiff. There is nothing at all in the informed consent that would indicate that Dr. Whitehouse is authorized to speak for Immunex. To the contrary, as I said, the informed consent forms indicate that it is Dr. Whitehouse's study, and Dr. Whitehouse is running the study, that he is going to make all the decisions, that he can choose people who should leave the study, that he or Immunex can stop the study at any time for any frame. Counsel, I'm sorry to interrupt, but I think you're repeating things you've said, and I've got a new question. Do we look at Montana law for this? Your Honor, there's a dispute over that. We believe that you look at Washington law because the contract was made in Washington, the study was to be performed in Washington. But I think we agree that on these agencies and the agency question, I think you look at Washington law, but I think it's academic because the law is the same in both places. Montana has a statute, I notice. Yes, it does, Your Honor. That's on actual agency, I believe, with the four factors. It has a statute on ostensible agency. Yes, Your Honor. And that's what we're discussing with you. Yes, Your Honor. And as Judge Gould said, Washington law is the same? Washington law is the same without a statute. It is, and it's the same. The common law is the same? The common law is the same, which is there must be a holding out, an actual act or a mission. The Montana statute requires some fault on the basis of the principle in order to create an ostensible agency unless it's on purpose. We know it's not intentional here. Yes, Your Honor, that's absolutely right. If an agency is ostensible, that means the same thing as a parent agency in common law, right? Yes, it does, Your Honor. An agency is ostensible when the principle intentionally, which didn't happen here, or by want of ordinary care, causes a third person to believe another to be the principle's agent. That just wasn't met here. That's Montana law. Yes, Your Honor. Now, Washington law, do you happen to recall the exact words of the Washington? I don't recall the exact words, Your Honor, but I do require that it requires action or a mission, a wrongdoing, something that is needed. I want to look at the right authority so I don't have to just rely on rhetoric. Do you happen to recall what the right authority is? I don't have it. I don't have it right in front of me, Your Honor. I do believe it's in our brief. Well, you think it's Washington law that's applied? We believe it. We've argued that it's Washington law that applies. And the plaintiffs have vigorously argued that it's Montana law that applies. We believe that on these questions it leads to the same result, which is what Judge Montgomery found in his summary judgment opinion. Thank you. Even apart from that, my understanding is that if you don't plead a different law in the jurisdiction where the suit is brought, that the law of that jurisdiction applies, and that would be Montana. We have taken a position from the first motion to dismiss, we filed, Your Honor, that Washington law applies. And that was addressed. Plaintiffs have taken a position that Montana law applies, and Judge Malloy addressed it by saying, essentially, it doesn't make any difference on these issues. I don't have to make that decision because the law is the same. You don't happen to remember the name of the Washington case that does the job for you on ostensible or apparent authority? I assumed you had read your brief and you would know these things. Your Honor, I have read the brief, and I will be honest. We did not brief Washington law as thoroughly as we did Montana law because of the plaintiff's position that it was Montana law and because that was basically what Judge Malloy used below. But if you think it's Washington law, and that's probably right because you brought that to the Court's attention early on, maybe we do need to have a close look at Washington law. Yes, Your Honor. I'm sorry to take time. Footnote 29 of the brief. Judge Feinfeld, the substantive law of Washington is similar. Apparent authority to act as an agent arises. Quote, when a principal makes objective manifestations to a third party that leads the third party to believe the person is the agent of the principal. Hansen v. Horan Rapids. Ostensible authority, quote, may be inferred only from the acts of the principal, not from the acts of the agent. Hansen again. See also the King's case. The King case, which, and this may touch on what Judge Gould asked, the plaintiff's actual subjective belief must be objectively reasonable. So it must be conduct on the part of immune acts, and it must be objectively reasonable, which it's not here under all of the circumstances. As I mentioned, and I won't repeat myself because you pointed out a tendency to do that, and I apologize for going over, and thank you for letting me do so. Thank you very much, Your Honor. Thank you, counsel. Good morning, Your Honors. Clifford Edwards on behalf of Vinyon Riddles. Immune acts under the Montana statute, and, of course, we believe Montana law applies. I think Montana law applies, right? Yes, because Dr. Hayes read about the Libby Montana asbestosis victims. I thought it was kind of amusing because I thought your case was better under Washington law, but if you want Montana law, here you are. Well, under Montana law, it looks as though you're going to need fault for ostensible authority, and I don't get where you get the fault. It says it's not actual here. It goes through that. And then it says want of ordinary care is needed for ostensible authority. Want of ordinary care causes the third person to believe another to be the principal's agent when that person is not really employed by the principal. Judge Klenfeld, we believe that under the Montana statute, this is exactly what Immunex did. They sought out Dr. Whitehouse because they read about him in the newspaper that he was treating all these asbestos victims in Libby. They went to him, and they made sure they never had any contact with any of the victims that were to be studied. They wanted it all done through him. It's a medical study, so to me at least that argument doesn't seem correct. It's a medical study. It's conducted by a doctor. So I don't see how that alone can be viewed as clothing the doctor with authority to speak for the drug company. Do you have any authority that says that? I think simply by the actions, Judge Gould, that were the ten original participants they knew of no one other than Dr. Whitehouse that was taking care of them in Montana on this study. And Binion Riddle were the only two that did any good. We have some other procedural problems with this summary judgment. Does your case mean if you win that whenever a doctor gives free samples of something and says, Here, try this, that he's an apparent or ostensible agent of the drug company? No, Judge. What's the distinction? Here we've got one distinction, which is the written agreement, but it cuts against you. What is the distinction that cuts in your favor to distinguish your case from the doctor who gives out free samples? I think it's the NIDIN study. We were provided very late after we had taken depositions of Dr. Hayes and other MNX officials that were involved in this, and I think they are stopped and waived. We had filed a motion on this that the judge didn't consider. There were 18 motions that were pending that weren't ruled on. This was very serious. We moved for sanctions because we were withheld the documents that we could have used to cross-examine Dr. Hayes. And it's about compassionate use, Judge. And in the compassionate use, that is what the Dr. Whitehouse asked. He testified that he asked Dr. Hayes if there would be compassionate use, and she said yes. That's his testimony on the record. She said, No, I would never use the phrase. When we got the late discovery, we found that Hayes was doing exactly what she said she would never do in the NIDIN study down at USC. She was giving compassionate use, which means for free. I thought compassionate use meant an unapproved drug given in terminal patients. Compassionate use in the context of the NIDIN and in this, everyone that was involved understood it to be free because it's $1,500 a month. Well, it may come out for free there because if it's totally unapproved, it's against the law for the drug company to charge for it. But an off-label use, compassionate use, where it's legal to charge for it, I don't get that. And on our record. I remember in the AIDS dispute it was about that. Is there anything in the record that says, like expert opinion, that says what the term compassionate use means in the medical field? Yes. We had an expert that had worked for the FDA. Her report was of record at the time of summary judgment for Rule 26. And in the going to the NIDIN study that had been withheld from us, where compassionate meant it was for free for the study participants until some hoped they could get some insurance coverage for it. These people are disabled. They can't afford $1,500 a month, Judge. And Amgen was doing exactly, with the NIDIN study in California, what Dr. Whitehouse said that he was told would happen here if somebody got better on this drug. And these two people got very much better on the drug. And, unfortunately, they haven't had the drug now for almost five years, and they're regressing. The summary judgment, I think, was given the status of the record. All of the contradictory facts, the NIDIN study, I think, has stopped them from saying they don't provide it, compassionate for free, because they were right during this time down in California. And summary judgment completely inappropriate under that, as well as the expert opinions, the issues of fact. Dr. Whitehouse himself would be an absolute contradiction to what Amgen says in his own testimony. So we have expert testimony on the subject, as well as the study doctor absolutely sticking that he had been told it would be compassionate use, and he understood that that would mean for free, because these people couldn't possibly afford the $1,500 a month. And that was the state of the record that summary judgment was granted on. And I disbelieve it was improper, and I see that I'm improper because I'm over your red light, Your Honor. And I probably better stop. Thank you, counsel, unless my colleagues have further questions. All right. Thank you. We'll submit the case.
judges: Fletcher, Canby, Hall